IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| WIREGRASS HOMEBUILDERS, INC., a Georgia Corporation | §<br>§<br>§ | PLAINTIFF/<br>COUNTER-DEFENDANT |
| V. | §<br>§ | Civil No. 1:09CV256-HSO-JMR |
| INVESTMENT ACQUISITIONS GROUP, LLC, CHARLES A. WEBB, III, LEWIS G. NEGROTTO, IV, NEGROTTO & ASSOCIATES, PLLC, U.S. TITLE COMPANY, PLLC, and JOHN/JANE DOES 1-5 | §<br>§<br>§<br>§<br>§<br>§<br>§ | DEFENDANTS/<br>COUNTER-PLAINTIFFS/<br>THIRD-PARTY PLAINTIFFS |
| JANET TAYLOR-BRYAN, GLENDA POULOS, FIRST REALTY, INC., COASTAL PROPERTY PROS, LLC, COASTAL PROPERTIES AND DEVELOPMENT, INC., RAYMOND R. YATES, JAMES R. GUERINO, and JOHN/JANE DOES 1-5 | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | THIRD-PARTY DEFENDANTS |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART WITHOUT PREJUDICE CERTAIN DEFENDANTS' MOTION TO SET ASIDE ASSIGNMENTS AND TO DISMISS, DENYING AS MOOT CERTAIN THIRD-PARTY DEFENDANTS' MOTION TO DISMISS, AND DISMISSING CASE WITHOUT PREJUDICE**

BEFORE THE COURT are the Motion to Dismiss [51] filed by Third-Party

Defendants Janet Taylor-Bryan, Glenda Poulos, Coastal Property Pros, LLC, and

Coastal Properties and Development, Inc. [collectively, "Moving Third-Party

Defendants"], and the Motion to Side Aside Assignments and to Dismiss [63] filed by

Defendants Investment Acquisitions Group, LLC ["IAG"], Lewie G. Negrotto, IV

["Mr. Negrotto"], Negrotto & Associates, PLLC ["Negrotto & Associates"], and U.S.

Title Company, PLLC ["U.S. Title"] [collectively, "Moving Defendants"].  Both

-1-

Motions are now fully briefed.  After consideration of the Motions, the pleadings, the record in this case, and the relevant legal authorities, and for the reasons discussed below, the Court finds that, because it lacks jurisdiction over this matter, Moving Defendants' Motion to Side Aside Assignments and to Dismiss [63] must be granted in part and denied in part without prejudice.  Moving Third-Party Defendants' Motion to Dismiss [51] will be denied as moot, and this case will be dismissed without prejudice for lack of jurisdiction.

## I.  BACKGROUND

A.    Factual Background

Plaintiff Wiregrass Homebuilders, Inc. ["Wiregrass" or "Plaintiff"], filed its Complaint [1] on April 6, 2009, invoking this Court's diversity jurisdiction, pursuant to 28 U.S.C. § 1332.  Compl., at ¶ 12.  This dispute involves the purchase of certain real property [the "Property"] located in Harrison County, Mississippi, which was owned by Catherine Hanson and the Herbert C. Hanson Residuary Trust [collectively, the "Hansons"] during the relevant time period, up and until June 2009, when the Hansons conveyed the Property by warranty deed to Wiregrass.  *Id.* at ¶¶ 13-14.

According to Wiregrass, Third-Party Defendant Janet Taylor-Bryan ["Bryan"] was a real estate broker from Florida who acted as an agent for Wiregrass and Northwest Florida Operations, Inc. ["Northwest"], "an affiliate company" of Wiregrass, at all pertinent times.  *Id.* at ¶¶ 15-16.  After Hurricane Katrina struck on August 29, 2005, Bryan contacted Third-Party Defendant Glenda Poulos

["Poulos"], a real estate broker associated with Third-Party Defendant Coastal Property Pros, LLC, in Gulfport, Mississippi. *Id.* at ¶ 17. After certain state gaming legislation was enacted, Bryan and Poulos decided to seek available 300 to 400 acre tracts of property in Harrison County, Mississippi, for development. *Id.* at ¶ 18. Wiregrass alleges that Bryan and Poulos approached Defendant Lewis G. (Skip) Negrotto, IV ["Negrotto"], a real estate attorney, about assisting them in finding suitable property. According to Wiregrass, Bryan, Poulos, and Negrotto agreed that Negrotto would share in the real estate commission, as an attorney-agent for their "client,"[1] if they were successful in locating a property. *Id.* at ¶ 19.

Negrotto purportedly learned that the Hanson Property might be for sale, and so advised Bryan and Poulos. When queried about the price the Hansons were seeking for the Property, Negrotto allegedly told Poulos and Bryan that the asking price was $13,500.00 per acre. Compl., at ¶¶ 20-21. Wiregrass and Northwest decided to make an offer to purchase the Property at this per acre price. *Id.* at ¶ 21.

Northwest prepared and signed a Letter of Intent in December 2005, offering to buy the Property at $13,500.00 per acre, for a total purchase price of $4,972,500.00. *Id.* at ¶ 22 (citing Letter of Intent, attached as Ex. "1" to Compl.). Wiregrass alleges that the Letter of Intent was delivered to Negrotto with instructions that Northwest wanted to close the transaction immediately, before the end of the year, if possible. *Id.* Wiregrass accuses Negrotto of meeting with a

---

[1]Wiregrass refers to itself and Northwest as a singular "client" in its Complaint. *See* Compl., at ¶¶ 18–19. For reasons which are discussed in more detail elsewhere herein, it is telling that Wiregrass refers to itself and Northwest as one indivisible "client" of Bryant, Poulos, and Negrotto.

representative of the Hansons and advising that he had a buyer willing to purchase the Property for a lower price, $10,600.00 per acre, a price which the Hansons had indicated they were willing to accept. *Id.* at ¶ 23.

According to the Complaint, on January 5, 2006, Negrotto transmitted to Poulos and Bryan a memorandum purportedly sent from Defendant Charles A. Webb, III ["Webb"], to Negrotto, which represented that there was another purchaser who had contractual rights to purchase the Property, namely Webb and Defendant Investment Acquisitions Group, LLC ["IAG"]. Compl., at ¶¶ 24-26. Wiregrass maintains that the memorandum represented that Webb and IAG would be able to offer the Property to Northwest within a couple of weeks, under the terms of Northwest's Letter of Intent, when in fact the memorandum was a complete ruse designed, drafted, and prepared by Negrotto and Webb to mislead and defraud Northwest. *Id.* at ¶¶ 26-28. Wiregrass asserts that, at the time the memorandum was transmitted to Poulos and Bryan, neither Webb nor IAG had any relationship with the Hansons or any rights to the Property, and that Negrotto and Webb conspired to obtain an option to purchase the Property from the Hansons for a significantly lower amount than Negrotto had quoted Northwest. Wiregrass contends that Negrotto's plan was to then assign that option to Northwest for a profit. *Id.* at ¶¶ 29-30.

On February 1, 2006, Negrotto transmitted another memorandum, purportedly from Webb, which Wiregrass asserts was actually drafted by Negrotto in an attempt to hide his involvement in the transaction. *Id.* at ¶¶ 33-34. The

February 1, 2006, memorandum gave Northwest until 3:00 p.m. on Friday, February 6, 2006, to execute the Assignment of the Option, but Northwest requested that Negrotto secure an extension until Monday, February 10, 2006. *Id.* at ¶¶ 35-36. Wiregrass alleges that Negrotto and Webb devised another memorandum, purportedly from Webb to Negrotto, dated February 6, 2006, which granted the requested extension, conditioned upon Northwest terminating/releasing the Letter of Intent to the Hansons, and stated that Webb had a backup offer on the Property, which Wiregrass alleges was not true. *Id.* at ¶¶ 36-39.

On February 7, 2006, Northwest executed the Assignment of the Option, which provided that Northwest would pay the full price of $4,972,500.00 for the Property. This meant that IAG would receive the excess over the undisclosed, lower amount the Hansons were receiving for the Property. Compl., at ¶ 40. On June 7, 2006, Northwest assigned its rights under the Assignment to Wiregrass, and on June 9, 2006, Negrotto conducted a closing of the transaction at his office. The Hansons received $3,869,000.00 in gross sale proceeds. *Id.* at ¶¶ 41-42. Wiregrass contends that, according to the HUD Statement provided by Negrotto, IAG received $1,033,500.00 at the closing. *Id.* at ¶ 43. Wiregrass claims that the Hansons' HUD Statement did not disclose the amount Wiregrass actually paid for the Property, and that neither it nor Northwest was aware that Negrotto and Webb had sold the Property for $1,058,500.00 more than the Hansons were paid. *Id.* at ¶¶ 42-43.

In February 2009, the Hansons and Northwest each assigned to Wiregrass all of their rights, title, and interest in and to any and all claims or choses in action

they might have against IAG and "any other person, firm or entity arising out of or in any way related to the preliminary negotiations, contracts, options, assignments, sale, closing on" the Property.  Assignments [3], attached as Exs. "6" and "7" to Compl.  Wiregrass then filed its Complaint on April 6, 2009.

B.    Procedural History

The Complaint asserts claims for breach of the standard of care, breach of fiduciary duty, fraud, misrepresentation, negligent misrepresentation, tortious interference with a business relationship, conspiracy, unjust enrichment, accounting, disgorgement, and constructive trust on behalf of Northwest, *see* Compl., at ¶¶ 48-95, and breach of the standard of care, breach of fiduciary duty, fraud, misrepresentation, negligent misrepresentation, tortious interference with a business relationship, conspiracy, unjust enrichment, constructive trust, disgorgement, and accounting, on behalf of the Hansons, *see id.* at ¶¶ 96-138. Wiregrass advances no independent claims of its own.

On July 17, 2009, Defendants IAG, Negrotto, Negrotto & Associates, and U.S. Title Company, PLLC ["U.S. Title"] [collectively, "Third-Party Plaintiffs" or "Counter-Plaintiffs"], filed their Amended Answer, Counterclaim, and Third-Party Claim [28].  They raise claims for breach of the standard of care, breach of fiduciary duty, fraud, misrepresentation, negligent misrepresentation, tortious interference with a business relationship, conspiracy, unjust enrichment, accounting, disgorgement, and constructive trust against Third-Party Defendants Bryan, First Realty, Inc., Poulos, Coastal Property Pros, LLC, Coastal Property and Development, Inc., James R. Geurino, and Raymond R. Yates [collectively "Third-Party

Defendants"].  Am. Answer, at ¶¶ 24-69.  As Counter-Plaintiffs, they advance claims

for abuse of process, breach of the standard of care, breach of fiduciary duty, fraud,

misrepresentation, negligent misrepresentation, tortious interference with a

business relationship, conspiracy, unjust enrichment, accounting, disgorgement, and

constructive trust against Wiregrass and Northwest.  *Id.* at ¶¶ 71-127.

Third-Party Defendants Bryan, Poulos, Coastal Property Pros, LLC, and

Coastal Properties and Development, Inc., now seek dismissal of the Third-Party

Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(4), (5), and (6).  Third-

Party Defs.' Mot. to Dismiss [51], at pp. 1-2.  Defendants IAG, Negrotto, Negrotto &

Associates, and U.S. Title seek to set aside the Assignments from Northwest and the

Hansons to Wiregrass, and seek dismissal of this action.  Mot. to Set Aside and to

Dismiss [63], at pp. 1-2.  Because the issue of this Court's subject matter jurisdiction

is raised in the latter Motion [63], the Court addresses it first.

## II. DISCUSSION

A.   Defendants' Motion to Set Aside and to Dismiss [63]

Defendants maintain that the Complaint should be dismissed for failure to

join Northwest and the Hansons as Plaintiffs as real parties in interest, pursuant to

Federal Rule of Civil Procedure 17, and as indispensable parties, pursuant to Rule

19.  Mot. to Set Aside and to Dismiss [63], at pp. 1-2.  They also contend that the

Assignments from Northwest and the Hansons to Wiregrass were improperly and/or

collusively made to create diversity jurisdiction where none existed, in contravention

of 28 U.S.C. § 1359, such that this Court lacks diversity jurisdiction under 28 U.S.C.

§ 1332.  *Id.* at p. 2.  Finally, Defendants argue that Plaintiff is precluded from

maintaining this action pursuant to Mississippi Code § 79-4-15.02, as neither Wiregrass, Northwest, nor any of their other affiliates, are authorized to do business in Mississippi via a Certificate of Authority, when they are in fact doing business within the State. *Id.*

The Fifth Circuit has instructed that "[w]hen a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Randall D. Wolcott, M.D., P.A. v. Sebelius,* 635 F.3d 757, 762 (5th Cir. 2011) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

1.    <u>Legal Standard</u>

A party invoking federal subject matter jurisdiction bears the burden of proof on a Rule 12(b)(1) motion to dismiss. *Id.* (citing *Ramming*, 281 F.3d at 161). To determine whether subject matter jurisdiction exists, the Court may look to "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* (quoting *Ramming*, 281 F.3d at 161). Under the circumstances and the record presented here, the Court finds that the third option is the most appropriate, as there are disputed questions of fact which the Court must resolve in order to determine whether it has subject matter jurisdiction.

2.    <u>Analysis</u>

Section 1332 provides that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of

different States . . . ."  28 U.S.C. § 1332.  The party seeking to invoke federal jurisdiction, Plaintiff Wiregrass in this case, has the burden of proving the facts necessary to sustain jurisdiction.  *Harvey Const. Co. v. Robertson-CECO, Corp.*, 10 F.3d 300, 303 (5th Cir. 1994).  While complete diversity appears on the face of the Complaint, and there is no dispute that the requisite amount in controversy is satisfied, Defendants argue that, but for the Assignments from Northwest and the Hansons to Wiregrass, the Court would not have diversity jurisdiction.  Mot. to Set Aside and to Dismiss [63], at p. 2.  Northwest and the Hansons are apparently Florida and Mississippi citizens, respectively, as are some of the named Defendants.  Compl., at pp. 2-4.  Wiregrass is diverse from all named Defendants, but asserts no independent claims of its own in the Complaint, only ones on behalf of Northwest and the Hansons.

Defendants first attack the Assignments on their face, arguing that Northwest and the Hansons are the real parties in interest.  Mot. to Set Aside and to Dismiss [63], at p. 2.  This is in effect an attack on Plaintiff's assertion of diversity jurisdiction under 28 U.S.C. § 1332, as Northwest and the Hansons are non-diverse parties from named Defendants.  Defendants further contend that the Assignments are improper and/or collusive and made to create diversity jurisdiction where none existed, in violation of 28 U.S.C. § 1359.  *Id.*  Wiregrass responds that it received a complete Assignment of the Hansons' and Northwest's claims, and as a matter of law, the Assignment was not improper or collusive pursuant to § 1359.  Pl.'s Mem. in Supp. [76] of its Resp., at pp. 9–10.

### a. *Facial Attack on Assignments under Mississippi Law*

In determining the identity of a real party in interest, a federal court sitting in diversity must look to state law to determine which party holds the relevant substantive right. *Farrell Const. Co. v. Jefferson Parish, La.*, 896 F.2d 136, 140 (5th Cir. 1990). The question here is whether, under Mississippi law, the Assignments are valid on their faces, such that the Hansons' and Northwest's rights passed to Wiregrass, making Wiregrass the real party in interest. This question goes more to the merits of the case, in that it implicates the question of whether the Assignments are valid under state law. This is a separate inquiry from whether the Assignments, even if valid, were made for the purpose of improperly or collusively obtaining diversity jurisdiction. Because the Court determines that it lacks jurisdiction under 28 U.S.C. § 1359, the Court need not resolve whether the Assignments were valid under Mississippi law.

### b. *Section 1359*

Assuming for the sake of argument that the Assignments were valid under Mississippi law, the Court must look behind them to assess whether they were collusive pursuant to 28 U.S.C. § 1359. 28 U.S.C. § 1359 provides that "[a] district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." 28 U.S.C. § 1359. "Section 1359 is designed to prevent the litigation of claims in federal court by suitors who by sham, pretense, or other fiction acquire a spurious status that would allow them to invoke the limited

-10-

jurisdiction of the federal courts." *Delgado v. Shell Oil Co.*, 231 F.3d 165, 178 (5th Cir. 2000) (quoting *Nolan v. Boeing Co.*, 919 F.2d 1058, 1067 (5th Cir. 1990)). "[I]t has generally been restricted to circumstances involving assignment of interests from non-diverse to diverse parties to collusively create diversity jurisdiction." *Id.* "The purpose of the statute is to prevent the manipulation of jurisdictional facts where none existed before-for example, through collusive assignments from a non-diverse party to a diverse party." *Nolan*, 919 F.2d at 1067. As the Court has previously observed, the Assignments here were from non-diverse parties to a completely diverse one.

Counsel for Wiregrass has submitted evidence, through his own Affidavit, Aff. of Michael Holleman, at ¶ 3, attached as Ex. "1" to Pl.'s Resp. [75], to support the position that jurisdiction was not a motivation, or even a consideration, in either Assignment. Nevertheless, it is black-letter law that a federal court has an obligation to inquire *sua sponte* into its own subject matter jurisdiction. *MCG, Inc. v. Great Western Energy Corp.*, 896 F.2d 170, 173 (5th Cir. 1990). This obligation, coupled with section 1359's prohibition, requires the Court to determine whether a party has been insinuated into an action in order to artificially invoke its jurisdiction. 28 U.S.C. § 1359; *McCulloch v. Velez*, 364 F.3d 1, 5 (1st Cir. 2004). The Court is under a parallel duty to take steps to assess whether any party has been omitted from pending litigation in order to permit the unwarranted invocation of federal jurisdiction. 28 U.S.C. § 1359; *McCulloch*, 364 F.3d at 5.

*(1).     Presumption of Collusiveness*

Though the Fifth Circuit has neither adopted nor rejected this approach,

other circuits have held that assignments between certain closely related entities

are presumptively ineffective to create diversity jurisdiction.  *See, e.g., McCulloch*,

364 F.3d at 6 (corporation to its sole owner); *Airlines Reporting Corp. v. S&N*

*Travel, Inc.*, 58 F.3d 857, 863 (2d Cir. 1995) (numerous air carriers to their not-for-

profit representative created to function as clearing house and collection agent for

transactions between carriers and travel agents); *Nike, Inc. v. Comercial Iberica de*

*Exclusivas Deportivas, S.A.*, 20 F.3d 987, 991–92 (9th Cir. 1994) (subsidiary to

parent corporation); *Dweck v. Japan CBM Corp.*, 877 F.2d 790, 792 (9th Cir. 1989)

(corporation to its officers or directors); *Simpson v. Alaska State Comm'n for*

*Human Rights*, 608 F.2d 1171, 1174 (9th Cir. 1979) (parent to subsidiary);

*Prudential Oil Corp. v. Phillips Petroleum Co.*, 546 F.2d 469, 475 (2d Cir. 1976)

(parent to wholly-owned subsidiary engaged in no business other than prosecution

of claim); *but see Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1314

(11th Cir. 2007) (factually distinguishing *Prudential* and *S&N Travel,* and refusing

to apply presumption of collusion to "upstream" assignments–those from subsidiary

to parent); *Herzog Contracting Corp. v. McGowen Corp.*, 976 F.2d 1062, 1067 (7th

Cir. 1992) (holding that "no inference of collusive invocation of jurisdiction can be

drawn from the simple fact that assignor and assignee are under common

ownership").

-12-

Those cases applying the collusive presumption allow for a method of rebutting the presumption, but the ultimate burden of proving that jurisdiction exists remains with the party invoking it. *See, e.g., Airlines Reporting*, 58 F.3d at 863 ("simply offering evidence of a business reason will be insufficient to rebut the presumption.  Instead, the burden falls on the party asserting diversity to demonstrate that the reason given for the assignment is legitimate, not pretextual."); *Prudential Oil*, 546 F.2d at 476 (the assignee "may rebut or meet the presumption by offering evidence that the transfer was made for a legitimate business purpose unconnected to the creation of diversity jurisdiction").  With this in mind, the party asserting jurisdiction must demonstrate that the "legitimate business reason" given is actually legitimate, not pretextual.  *Airlines Reporting*, 58 F.3d at 863.  The Court finds that the weight of persuasive authority supports the Court following the collusive presumption approach.  The Court will therefore utilize this approach in analyzing the Assignments in question here.

Notwithstanding the fact that Wiregrass and Northwest do not have a parent-subsidiary relationship and do not have any officers, directors, or shareholders in common, Pl.'s Mem. in Supp. [76] of its Resp., at p. 6, they are indisputably affiliated entities.  Wiregrass' own Complaint plainly states that Northwest is "an affiliate company of WIREGRASS HOMEBUILDERS, INC." Compl., at p. 4.  Though Wiregrass' counsel now attempts to retreat from and soften this statement in its own Complaint, Aff. of Michael Holleman, at ¶ 44, attached as Ex. "1" to Pl.'s Resp. [75], the Court is persuaded that, to the extent there can be

any factual dispute on this point, the record demonstrates that these entities are in fact "affiliated," such that the presumption of collusiveness should apply.

Leaving aside Wiregrass' clear admission in its Complaint, the facts contained in the record as a whole reveal how closely related these entities are. As noted earlier, the Complaint refers to Wiregrass and Northwest by the singular term "client." Compl., at ¶¶ 18–19. Janet Taylor-Bryan, the real estate broker from Florida, acted as an agent for both Wiregrass and Northwest. *Id.* at p. 4; Pl.'s Mem. in Supp. [76] of its Resp., at p. 10. Bryan also worked in 2005 for Wiregrass for "other non-Mississippi developments." *Id.* She has testified by affidavit that she has served as real estate broker and agent "on other projects for each of the companies in other states, individually and jointly." Aff. of Janet Taylor-Bryan, at ¶ 3, attached as Ex. "3" to Pl.'s Resp. [75].

When the parties learned of the Hansons' purported asking price, "NORTHWEST and WIREGRASS decided to make an offer on the property at the full purchase price per acre provided by NEGROTTO." Compl., at p. 5. Northwest made the actual offer to purchase the Hanson Property, Compl., at p. 7, delivered its original formal Letter of Intent on December 21, 2005, Pl.'s Mem. in Supp. [76] of its Resp., at p. 11, and executed the Assignment of Option Contract with IAG on February 7, 2006, Pl.'s Mem. in Supp. [76] of its Resp., at p. 13. "Because Wiregrass and Northwest hoped to develop the Hanson property together, Wiregrass paid the $25,000.00 consideration for the assignment." *Id.* "On June 7, 2006, two (2) days before the closing, Northwest assigned its rights in the Hanson property to

-14-

Wiregrass." *Id.* at p. 14.  Wiregrass now alleges that it and Northwest "are two

entirely separate companies which have, on occasion, developed properties in other

states together.  They considered developing the Hanson Property together, before

Northwest decided not to participate." *Id.*  Wiregrass then closed on the Property

on June 9, 2006. *Id.*

However, Wiregrass and Northwest "are involved in property development in

the southeast and have developed some properties together."  Aff. of James R.

Guerino, at ¶ 3, attached as Ex. "2" to Pl.'s Resp. [75]; *see* Aff. of Janet Taylor-Bryan,

at ¶ 4, attached as Ex. "3" to Pl.'s Resp. [75].  Wiregrass and Northwest are also

represented by the same counsel in this case.

As with assignments between parent and subsidiary companies, the transfer

of legal title to the claims between closely related parties like Wiregrass and

Northwest can easily be arranged, increasing the potential for collusion and

compounding the difficulty in detecting the true purpose for the assignment.  *See*

*Airlines Reporting*, 58 F.3d at 863.  The Court therefore finds that the presumption

of collusion applies to Northwest's Assignment of its rights, title, and interest to any

and all claims or choses in action in this case to Wiregrass.

The Court now turns to whether Wiregrass has rebutted the presumption of

collusiveness.  After considering the pleadings and the undisputed facts, and

resolved disputed facts, the Court concludes that it has not.  Though it has offered

conclusional statements about having legitimate business reasons for procuring the

Assignments, Wiregrass has not satisfactorily articulated those reasons.  Therefore, § 1359's jurisdictional barrier applies in this case, and dismissal is warranted.

### (2).   Collusiveness under § 1359 without Applying the Presumption

Even if the aforementioned presumption does not apply, the Court nevertheless finds that Plaintiff Wiregrass has not met its burden of demonstrating the existence of jurisdiction in this case.  After evaluating the Assignments in question under existing precedent, the Court is convinced that § 1359 applies, such that it lacks jurisdiction.  In conducting this analysis under § 1359, the Court is guided by Supreme Court and Fifth Circuit precedent, and "its ultimate inquiry is into motive and purpose with substantiality of stake a relevant but not controlling indicator. . . ."  *Bianca v. Parke-Davis Pharm. Div. of Warner-Lambert Co.*, 723 F.2d 392, 399 (5th Cir. 1984).

On one hand, Plaintiff's counsel's Affidavit avers that jurisdiction was not a motivation, or even a consideration, in procuring either Assignment.  Aff. of Michael Holleman, at ¶ 3, attached as Ex. "1" to Pl.'s Resp. [75].  On the other, there is significant record evidence which raises doubt as to such assertions.  Though they do not have a subsidiary/parent relationship and do not have common shareholders or boards, Wiregrass and Northwest are affiliated companies in the sense that they are in business together and commonly work together on real estate transactions.

In determining whether assignments have been improperly or collusively made, the Fifth Circuit has adopted the Third Circuit's "motive/function" rule

espoused in *McSparran v. Weist*, 402 F.2d 867 (3d Cir. 1968).  *See Bianca*, 723 F.2d at 395.  This approach considers whether there was an intent to manufacture diversity, and whether there is sufficient substance to the Assignment to allow it to be recognized in a diversity suit.  *See id.* at 396.  The Fifth Circuit has noted that this rule was "bouyed" by the Supreme Court's decision in *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823 (1969).  *Id.* at 395.  The Fifth Circuit continues to apply the "motive/function" rule in its § 1359 analysis.  *GDQ Corp. v. Brass*, 229 F.3d 1148, 2000 WL 1239187, *1 (5th Cir. 2000) ("the inquiry under 28 U.S.C. § 1359 is guided by the 'motive/function' rule . . . .").

In examining federal court jurisdiction under the "anti-collusion" statute, the Second Circuit has considered the following non-exclusive factors:

> the assignee's lack of a previous connection with the claim assigned; the remittance by the assignee to the assignor of any recovery; whether the assignor actually controls the conduct of the litigation; the timing of the assignment; the lack of any meaningful consideration for the assignment; and the underlying purpose of the assignment.

*Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 547 F.3d 115, 124 (2d Cir. 2008) (quoting *Airlines Reporting Corp. v. S&N Travel, Inc.*, 58 F.3d 857, 862 (2d Cir. 1995)).

No single factor is dispositive.  *Id.*

In *Hytken Family Ltd. v. Schaefer,* 431 F. Supp. 2d 696 (S.D. Tex. 2006), the United States District Court for the Southern District of Texas applied a similar list of factors.  The court there explained that

> [s]ince the Supreme Court's decision in *Kramer*, courts across the country have considered the following factors: (1) whether there was nominal or no consideration involved in the assignment; (2) whether the assignee

-17-

had any previous connection to the assigned claim; (3) whether there was
a legitimate business reason for the assignment; (4) whether the timing
of the assignment suggests it was merely an effort to secure federal
diversity jurisdiction; (5) whether the assignor exercises any control over
the conduct of the litigation; and (6) whether the assignor retains any
interest in the action such as receiving a portion of the assignee's
recovery.

*Id.* at 699–700.  The Court turns to an analysis of the relevant factors.

### (a).   *Consideration*

Both Assignments purport to transfer assignors' rights, title, and interest to

Wiregrass for "Ten and 00/100 Dollars ($10.00) and other good and valuable

consideration, the receipt and sufficiency of which is hereby acknowledged. . . ."

Assignments [3], attached as Exs. "6" and "7" to Compl.  Defendants argue that,

"[t]hough the Assignments state on their face that they were obtained for good and

valuable consideration, Wiregrass has provided no proof in its Initial Disclosure to

support that statement."  Defs.' Mem. in Supp. [64] of Mot., at p. 2.

Wiregrass responds that the Hanson Assignment was a complete assignment

of the Hansons' claims, and that as a matter of law, it was not improper or collusive

pursuant to § 1359.  Pl.'s Mem. in Supp. [76] of its Resp., at p. 9.  Wiregrass

maintains that the consideration for the Assignment was the settlement of certain

state court litigation with Courtney Hanson, namely a replevin action by Courtney

Hanson and Bennie Saucier against Wiregrass, and a trespass action by Wiregrass

against Courtney Hanson and Bennie Saucier, which had been consolidated in state

court.  *Id.* a pp. 10–11; Aff. of Michael Holleman, at ¶¶ 2, 25–26, attached as Ex. "1"

to Pl.'s Resp. [75].  Defendants point out that, of the Hansons, only Courtney

Hanson was a party to those lawsuits, and that "Courtney Hanson has no legal right to act on behalf of his mother, Catherine Hanson or the Hanson Family Trust." Defs.' Rebuttal, at p. 2.  They also allege that the Hanson Assignment was not an arms length transaction.  *Id.*  The Court is persuaded that, because the settlement involved a non-party to the present litigation and related transactions, the consideration for the Hanson Assignment was only nominal.

As for the Northwest Assignment, Wiregrass points to its $25,000.00 payment to IAG on behalf of Northwest for the option contract for the Property. Wiregrass states that this was sufficient consideration for the June 7, 2006, Northwest Assignment, but admits that "[o]nly nominal consideration was paid for the 2009 Northwest Assignment."  Pl.'s Mem. in Supp. [76] of its Resp., at p. 29. However, Wiregrass insists that "[t]he payment of $25,000.00 was sufficient consideration to support both assignments."  *Id.*

The Court is not persuaded that Wiregrass' $25,000.00 payment to IAG for the 2006 Northwest Assignment was sufficient consideration for the 2009 Assignment.  Wiregrass paid the $25,000.00 to IAG as a binder on the purchase of the Property for Northwest's benefit on February 9, 2006, and Northwest assigned its rights in the Hanson Property to Wiregrass on June 7, 2006.  Aff. of Franklin Skinner, at ¶ 2, attached as Ex. "5" to Pl.'s Resp. [75].  It is unclear what benefit Northwest would have received from a 2006 payment on its behalf to a third party for assigning its claims and choses in action to Wiregrass in 2009.

Moreover, the 2006 Assignment, signed by Northwest's president, R. Richard Yates, and Wiregrass' president, Thomas F. Leonard, reads, in relevant part, as follows:

> For and in consideration of the sum of Ten Dollars and other good and valuable considerations, cash in hand paid, the undersigned Northwest Florida Operations, Inc., does hereby sell, convey, transfer and assign to Assignee all of its rights, title and interest in and to that certain Option Contract, subject to the modifications as stated here. A copy of Option Contract is attached here as Exhibit A.
>
> Upon execution of this Assignment, Assignee agrees to be bound by and obligated to perform for and in the place of Optionor/Assignor as defined in the Option Contract and in accordance with the terms and conditions as added herein.
>
> This Assignment of Option Contract shall inure to the benefit of and be binding upon the parties hereto, their heirs, legal representatives, successors, and assigns.

Assignment of Option Contract [75-8], attached as Ex. "1F" to Pl.'s Resp. [75].

Wiregrass has stated that it executed the subsequent Assignment in 2009 because its counsel thought it unclear whether the 2006 one "was sufficient to convey some rights to assert claims against Negrotto and others." Pl.'s Mem. in Supp. [76] of its Resp., at p. 16. This "clarification" argument is not persuasive. Wiregrass and Northwest each have distinct causes of action against Defendants, based on the transactions at issue in this case. Northwest's claims stem from its own negotiations and interactions with Defendants, and Wiregrass' independent claims arise out of its dealings with Defendants, post-assignment of Northwest's Option Contract in 2006, including any claims related to the closing on the Property.

-20-

Wiregrass has elected not to pursue any of its own causes of action. Instead, it has pursued only those Northwest and the Hansons possessed at the time the Assignments were executed. The Court finds that the 2006 and 2009 Northwest Assignments are distinct and convey different rights, such that the latter Assignment was necessary to convey the causes of action asserted here. The Court is not persuaded that the $25,000.00 paid by Wiregrass on Northwest's behalf in 2006 can be properly deemed consideration for the 2009 Northwest Assignment. Indeed, Wiregrass admits that "[o]nly nominal consideration was paid for the 2009 Northwest Assignment." Pl.'s Mem. in Supp. [76] of its Resp., at p. 29; *see* Aff. of James R. Guerino, at ¶ 9, attached as Ex. "2" to Pl.'s Resp. [75] ("Because Wiregrass had advanced the Option money on the IAG Assignment of Option Contract, the 2006 Northwest Assignment and the 2009 Northwest Assignment were made only for nominal consideration.").

In sum, the Court concludes that Wiregrass gave only nominal consideration for both the Northwest and the Hanson Assignments. Nominal consideration, even if sufficient to support a valid assignment under state law, supports a finding that these Assignments were improper or collusive for purposes of § 1359. *See Hytken*, 431 F. Supp. 2d at 700.

### (b). *Assignee's Previous Connection to Assigned Claims*

Wiregrass was involved from the beginning in the transactions which are the subject of this lawsuit. It has claims which are distinct from those of Northwest as well as those of the Hansons, yet it has only brought the claims previously held by

Northwest and the Hansons.  Wiregrass was not a complete stranger to these transactions or the claims arising out of them.  Out of an abundance of caution, the Court will consider this factor to weigh against a finding of improper and collusive Assignments.

### (c).  *Reason for Assignments*

The next factor is whether there was a legitimate business reason for completing the Assignments.  With respect to the Hansons, Wiregrass expressed its desire to settle certain state court litigation with Courtney Hanson, but Wiregrass has not submitted sufficient testimonial evidence explaining why obtaining the Assignment from all of the Hansons was so important to it, particularly where it had its own independent claims against Defendants but chose to forego them.  Though Wiregrass has offered conclusional statements that it had legitimate business reasons for procuring the 2009 Northwest Assignment, it has not articulated them.  Wiregrass' desire to develop the Hanson Property, which appears from the record to be its business reason for obtaining the original 2006 Assignment to purchase the Property, is distinct from its desire to pursue Northwest's claims against Defendants.  Wiregrass has not offered a sufficient legitimate business reason for these Assignments.  This factor supports the conclusion that the Assignments were improper and collusive.

### (d).  *Timing of Assignments*

The second Northwest Assignment was executed on February 28, 2009, and the Hanson Assignment was executed on February 18, 2009.  Both were executed

-22-

within seven (7) weeks of Wiregrass initiating this litigation on April 6, 2009.  The Complaint was filed some nineteen (19) months after the alleged fraud was discovered by Northwest's and Wiregrass' counsel herein.  *See* Aff. of Michael Holleman, at ¶ 15, attached as Ex. "1" to Pl.'s Resp. [75] (testifying that, during Courtney Hanson's deposition on September 5, 2007, in state court suit, counsel for Wiregrass and Northwest recognized that some type of fraud or breach of duty may have been perpetuated by Defendants).  This timing suggests that both Assignments were obtained merely in an effort to secure federal diversity jurisdiction.  This factor weighs in favor of a finding that the Assignments were effected for the purpose of establishing federal diversity jurisdiction.

### (e).  *Assignors' Control over Conduct of Litigation*

Though the parties have provided affidavit testimony that the assignors, Northwest and the Hansons, retain no control over the conduct of the litigation, the Court has noted previously that Wiregrass and Northwest share counsel in this matter, after a waiver of conflict was signed.  The Court is of the opinion that this factor is neutral as to the assessment of collusiveness.

### (f).  *Assignors' Retention of Any Interest in the Action*

In *Kramer*, the Supreme Court noted that it had "no occasion to re-examine the cases in which [the] Court has held that where the transfer of a claim is absolute, with the transferor retaining no interest in the subject matter, then the transfer is not 'improperly or collusively made,' regardless of the transferor's motive." *Kramer*, 394 U.S. at 828 n.9 (citations omitted).  However, earlier

-23-

Supreme Court precedent also indicates that, in evaluating the nature and validity of absolute transfers, a court must examine the consideration exchanged for the assigned claim. *See, e.g., Lehigh Mining and Manufacturing Co. v. Kelly*, 160 U.S. 327, 336–37 (1895) (recognizing presumption in every stage of cause of action in federal court that it is without jurisdiction, unless contrary appears from record, and holding that jurisdiction was collusively obtained when corporation made grant of disputed land to newly-created, out-of-state corporation, with common stockholders, without exchanging any valuable consideration).

In this case, the Assignments themselves do not explicitly state that Northwest or the Hansons retained any interest in the action. They appear to be complete transfers. However, neither do the Assignments include any provisions by which they expressly disavow any continuing interest in the litigation or its proceeds. The Court finds it difficult to conclude that, as closely affiliated as these entities appear to be from the record, Northwest retains absolutely no interest in the outcome of this litigation. Moreover, the Court has previously found that no valuable consideration was actually exchanged between the parties for the 2009 Assignment. This negates the validity of the purported absolute transfers of interest. In sum, the Court finds that this factor is neutral.

Reviewing all of these factors and the record as a whole, Wiregrass has not carried its burden of proving the facts necessary to sustain federal diversity jurisdiction, even by a preponderance of the evidence standard. *See Harvey Const. Co. v. Robertson-CECO, Corp.*, 10 F.3d 300, 303 (5th Cir. 1994). The Court is left to

conclude that the parties "have funneled what are essentially local disputes between non-diverse parties into the federal courts," a practice prohibited by section 1359. *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 125 (2d Cir. 2003). Reviewing the factors above *in toto*, the Court is persuaded that 28 U.S.C. § 1359 deprives it of original subject matter jurisdiction over this case. *Bianca*, 723 F.2d at 395. Dismissal is therefore required. FED. R. CIV. P. 12(h)(3).[2]

B.    Third Party Defendants' Motion to Dismiss [51]

    Because the Court lacks jurisdiction over the original claim in this matter, it must dismiss the entire action. FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Third-Party Defendants' Motion to Dismiss is therefore moot.

III.  CONCLUSION

    For the foregoing reasons, the Court is of the opinion that it lacks subject matter jurisdiction over this case. Dismissal is therefore required. FED. R. CIV. P. 12(h)(3).

    **IT IS, THEREFORE, ORDERED AND ADJUDGED** that, the Motion to Side Aside Assignments and to Dismiss [63] filed by Defendants Investment Acquisitions Group, LLC, Lewie G. Negrotto, IV, Negrotto & Associates, PLLC, should be and hereby is **GRANTED IN PART**, to the extent it seeks dismissal of

---

[2]Since the Court concludes that federal jurisdiction is lacking pursuant to 28 U.S.C. § 1359, it expresses no opinion as to the validity the Assignments themselves under state law.

this action, **and DENIED IN PART WITHOUT PREJUDICE**, to the extent it seeks to set aside the Assignments.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, for the reasons stated herein, the Motion to Dismiss [51] filed by Third-Party Defendants Janet Taylor-Bryan, Glenda Poulos, Coastal Property Pros, LLC, and Coastal Properties and Development, Inc., should be and hereby is **DENIED AS MOOT.**

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, this cause of action is hereby **DISMISSED WITHOUT PREJUDICE**, for lack of subject matter jurisdiction.

**SO ORDERED AND ADJUDGED**, this the 2nd day of August, 2011.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE